Barbara J. ANDERSON and Cedric Anderson, Plaintiffs-Respondents-Cross Appellants,

v.

Brad GARBER, M.D., and Osseo Medical Center, S.C., Defendants-Appellants-Cross Respondents,

WISCONSIN PHYSICIANS SERVICE INSURANCE CORPORATION, and Rural Mutual Insurance Company, Defendants.

Court of Appeals

*No. 90-0802. Submitted on briefs January 7, 1991.—Decided January 23, 1991.*

(Also reported in 466 N.W.2d 221.)

390

391

On behalf of the defendants-appellants-cross appellants, the cause was submitted on the briefs of *Beverly Wickstrom* and *Lisa K. Stark* of *Misfeldt, Stark, Richie & Wickstrom* of Eau Claire.

On behalf of the plaintiffs-respondents-cross appellants, the cause was submitted on the brief of *Lisa M. Drill* of *Doar, Drill & Skow, S.C.* of New Richmond.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.  Dr. Brad Garber and Osseo Medical Center, S.C. (collectively Garber) appeal a judgment and denial of post-trial motions in a medical malpractice action and urge that the claim was barred by the statute of limitations. Barbara Anderson and her husband (collectively Anderson) cross-appeal the trial court's decision to eliminate the jury award for medical expenses paid by her insurer. We conclude that the statute of limitations had not expired when Anderson filed her

action, and that the jury award of $10,000 for medical expenses should be reinstated.

## DISCOVERY OF INJURY

Garber contends the trial court erred by determining that the three-year statute of limitations, sec. 893.205, Stats. (1977), did not bar Anderson's malpractice claim. At issue is when Anderson "discovered" the injury that formed the basis of the action. We conclude that Anderson discovered her injury, and her cause of action accrued on the date when she was informed that her recurrent pain was caused by either an earlier surgery that severed her bile duct or by the subsequent surgery to repair the damage. Thus, Anderson's action was timely filed, and we affirm the trial court's ruling on this issue.

The following facts are undisputed: Initially, Dr. Brad Garber saw Barbara Anderson for severe abdominal pain in early May of 1979. He removed her gallbladder on May 17, 1979. Shortly after surgery, Brad Garber attended a medical seminar and left his patient in the care of Dr. Richard Garber. Following surgery, Richard Garber observed an excessive flow of bile from Anderson. He consulted Dr. Hudson, a general surgeon, who felt that her bile duct had been cut during the gallbladder surgery, and he recommended corrective surgery. Richard Garber informed Anderson of the need for corrective surgery to repair the severed bile duct. Hudson performed the surgery on May 23, 1979. After surgery, he told her that the corrective surgery was successful. Anderson's postoperative recovery was satisfactory, and she resumed seeing Brad Garber. At the time of her last visit with Brad Garber on July 17, 1979, she was no longer experiencing any pain and was feeling fine.

Subsequently, on October 10, 1979, she developed severe upper stomach pains and saw Brad Garber in the emergency room. Garber diagnosed her problem as a backup of gas and prescribed Mylanta. The condition was alleviated at that time. She asked Brad Garber if her problem could be related to the surgery, and he stated "it's a possibility."

Anderson continued to have intermittent pain, and she continued to see Brad Garber and Hudson. Between October 1979 and December 1979, Hudson informed her that he felt that her problem was caused by gas backup. She asked Hudson if it could be related to the surgeries and was informed "it may have been." Hudson also prescribed Mylanta for relief. The pain would usually subside in an hour, was tolerable and would disappear between episodes. The time period between episodes would vary between more than one a day to up to a week apart. She stated that both doctors appeared puzzled as to the cause.

In December 1979, she had additional tests at the request of either Brad Garber or Hudson. The results of the tests were negative. She continued to see Hudson for recurrent pain until 1984. Hudson ran several different tests but was unable to ascertain the actual cause of her problems. He informed her that the rerouting surgery of the gallbladder was a possible cause of her problems. At another time, he also informed her that he thought that blockage of the aorta was a possible cause of her problems. She continued to take Mylanta and Tagamet at his direction.

On February 1, 1984, she was admitted to the hospital for a more severe recurrence of her stomach pain. Her attending physician on this hospitalization was a Dr. Martin, who ordered liver and blood tests. Although Martin felt something was wrong, he was unable to tell

her the cause of the pain. He told her "it was possible it was related to the surgeries in May of 1979." She was released after one or two nights in the hospital, but continued to have the same periodic pain. In July 1985, she experienced a more severe attack of abdominal pain and was admitted to the hospital for four days. Her attending physician on this admission was Dr. Adams, who again ran additional tests. He was unable to diagnose the cause of her problem and referred her to Dr. Parent at the Marshfield Clinic, who saw her on August 13, 1985. Following testing, Parent specifically told her that because her bile duct had been severed during the prior surgeries at a location so close to a one-way bile duct valve, the one-way bile duct valve could no longer function and this was the cause of her pains.

Brad Garber's deposition was taken on November 12, 1986. In that deposition Garber stated that, looking back on the entire clinical picture, he still did not have an opinion as to the actual cause of Barbara Anderson's abdominal difficulties after her surgery. He further stated that he did not have any reason to believe she knew the cause of her problem. He further stated it was a condition that was difficult to find, that his clinic had not been able to determine the cause while she was under its care and that he felt she was making reasonable efforts to learn the cause of her problem. Garber further identified other possible causes of her abdominal pain, such as hepatic diathesis, gastritis, duodenitis and various types of recurrent psychological problems.

Hudson, in his deposition of January 13, 1989, stated that he did not know the cause of Anderson's problem during his treatment from July 1979 to July 1983. He stated that he was considering esophagitis and ulcer as more likely causes. Following Dr. Parent's diag-

nosis of the cause in August 1985, Anderson commenced the action against Brad Garber on May 22, 1986.

Garber now contends that Anderson discovered her injury when she was told in May 1979 that the common bile duct had been unintentionally severed, or at the latest in October 1979, when he told her that her abdominal pain could be related to the May surgeries. Where the facts are undisputed, the determination that a given date is the date of "discovery" within the meaning of the *Hansen* rule[1] is a matter of law, which we review de novo. *Borello v. United States Oil Co.*, 130 Wis. 2d 397, 404, 388 N.W.2d 140, 143 (1986).

Under Wisconsin law, a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of the injury, but also that the defendant's conduct probably caused the injury. *Id.* at 411, 388 N.W.2d at 146. As in *Borello,* we are asked to examine, first, whether she used reasonable diligence to secure competent medical advice, *see id.* at 414, 388 N.W.2d at 147, and, second, when Anderson "first received 'competent medical advice that her condition was *probably* caused' " by the tortfeasor's negligence. *See id.* at 412, 388 N.W.2d at 146 (quoting *Williams v. Borden, Inc.,* 637 F.2d 731, 733 (10th Cir. 1980)) (emphasis in original).

As to the issue of Anderson's diligence in seeking medical advice, the trial court found that "Barbara Anderson diligently tried to ascertain the cause of her abdominal pain problem." The record supports the trial court's conclusions. Anderson continued to see her phy-

[1] *Hansen v. A.H. Robins Co.,* 113 Wis. 2d 550, 335 N.W.2d 578 (1983).

sicians regularly, informed them of her ongoing pain and cooperated with all recommended testing procedures.

As to the second *Borello* inquiry, Garber contends that because Anderson was told prior to 1985 by a number of doctors that her pain could "possibly" be related to her surgeries, she knew of her injury and its cause earlier than 1985. We disagree. The *Borello* court emphasized that the medical advice received must be that a condition was a "probable" cause of the injury. *Id.* at 412, 388 N.W.2d at 146. There is, of course, a difference between a "possibility" and a "probability" that a given condition caused a given injury. We conclude that Anderson did not have a basis for objectively concluding that the severed bile duct or the corrective surgery was probably the cause of her ongoing pain until she saw Parent in August 1985. The trial court's ruling on this issue is affirmed.

## CROSS-APPEAL

On cross-appeal, the Andersons contend that the trial court erred by reducing the jury award for medical expenses from $10,000 to $321. The court ruled that $9,679 of Anderson's medical expenses were paid by WPS and Rural Mutual, each of whom had "lost their position to assert their claims [as subrogees] against the defendant by reason of their failure to file an answer" within twenty days when joined as defendants in an amended complaint. When the facts are undisputed and only a question of law is at issue, we review the trial court's determination de novo. *Doe v. Roe,* 151 Wis. 2d 366, 373, 444 N.W.2d 437, 441 (Ct. App. 1989).

We note at the outset that although the two insurers were necessary parties to the action under sec. 803.03(2), Stats., they were incorrectly joined as party defendants in an amended complaint. Section 803.03(2) provides in part:

Claims arising by subrogation, derivation and assignment. (a) *Joinder of related claims.* A party asserting a claim for affirmative relief shall join as parties to the action all persons who at the commencement of the action have claims based upon subrogation to the rights of the party asserting the principal claim, derivation from the principal claim, or assignment of part of the principal claim . . .. Any party asserting a claim based upon subrogation to part of the claim of another, derivation from the rights or claim of another, or assignment of part of the rights or claim of another shall join as a party to the action the person to whose rights the party is subrogated, from whose claim the party derives his or her rights or claim, or by whose assignment the party acquired his or her rights or claim.

(b) *Options after joinder.* Any party joined pursuant to par. (a) may 1. participate in the prosecution of the action, 2. agree to have his or her interest represented by the party who caused the joinder, or 3. move for dismissal with or without prejudice. If the party joined chooses to participate in the prosecution of the action, the party joined shall have an equal voice with other claimants in such prosecution. If the party joined chooses to have his or her interest represented by the party who caused the joinder, the party joined shall sign a written waiver of the right to participate which shall express consent to be bound by the judgment in the action. Such waiver shall become binding when filed with the court, but a party may withdraw the waiver upon timely motion to the

judge to whom the case has been assigned with notice to the other parties. A party who represents the interest of another party and who obtains a judgment favorable to such other party may be awarded reasonable attorneys fees by the court. If the party joined moves for dismissal without prejudice as to his or her claim, the party shall demonstrate to the court that it would be unjust to require the party to prosecute the claim with the principal claim. In determining whether to grant the motion to dismiss, the court shall weigh the possible prejudice to the movant against the state's interest in economy of judicial effort.

The statutory scheme clearly contemplates joining a plaintiff's insurer that has a subrogated claim for medical expenses as party plaintiff. *See* sec. 803.03(3), Stats. ("If the party should join as a plaintiff but refuses to do so, the party may be made a defendant, or, in a proper case, an involuntary plaintiff."). There is nothing in the record to indicate that WPS and Rural Mutual refused to join the action as plaintiff. When joined as a party plaintiff, no responsive pleading is required, and the twenty-day response requirement in sec. 802.09, Stats., does not apply. Once joined, however, the subrogee must exercise one of its statutory options under sec. 803.03(2)(b) or lose its subrogation rights in any settlement won by its insured. *Radloff v. General Cas. Co.*, 147 Wis. 2d 14, 18–19, 432 N.W.2d 597, 598–99 (Ct. App. 1988).[2]

The issue of whether WPS and Rural Mutual waived subrogation rights by their conduct and thus for-

---

[2]In *Radloff,* the insurer was required to endorse a settlement check negotiated by its insured, irrespective of the insured's refusal to reimburse the insurer for $2,000 in medical expenses paid prior to settlement. *Id.* at 16, 432 N.W.2d at 598.

feited any right to share in Anderson's judgment is not before us. Also, whether the assignment of their rights to Anderson after trial but before judgment was an appropriate exercise of the option to have one's interest represented by the party who caused the joinder, *see* sec. 803.03(2)(b)2, Stats., is not before us. The only issue properly before us is whether Anderson was entitled to judgment on the claim for medical expenses paid by the two subrogees.

Garber contends that this issue is governed by *Lambert v. Wrensch,* 135 Wis. 2d 105, 399 N.W.2d 369 (1987). The court in *Lambert* concluded that the tortfeasor and his insurer are entitled to a credit for payments the plaintiff received from another insurer (1) if the proceeds were paid out pursuant to an indemnity, as opposed to an investment policy; and (2) if the subrogated insurer's rights are barred because the applicable limitations period has run. *Id.* at 108, 117–18, 399 N.W.2d at 371, 375–76; *see also Petry v. St. Paul Fire & Marine Ins. Co.,* 151 Wis. 2d 343, 346, 444 N.W.2d 428, 429 (Ct. App. 1989).

In *Lambert,* however, the trial court's finding that the statute of limitations had run against the insurer was not challenged on appeal, and thus the *Lambert* court accepted the finding as fact. *Id.* at 110–14, 399 N.W.2d at 371–73. An earlier decision by this court, *Bruner v. Kops,* 105 Wis. 2d 614, 624–25, 314 N.W.2d 892, 897 (Ct. App. 1981), held that a plaintiff tolls the statute of limitations with respect to a subrogated claim under sec. 803.03(2)(a), Stats., by filing his or her principal claim in the action.[3] Because the issue decided in *Bruner* was not

---

[3]While we agree that the statute of limitations does not bar joinder of a subrogated claim, we note that filing the principal claim does not "toll" the statute to allow an independent claim by

before the court in *Lambert, Lambert* does not overrule *Bruner*. If we apply the *Bruner* rule to the facts in this case, the statute of limitations had not run against either subrogee, and *Lambert* does not apply.[4]

We distinguish *Lambert* from the present case on an additional ground. In *Lambert,* the court specifically held that the insurer "did not, either by contract or conduct, waive its right to subrogation." *Id.* at 118, 399 N.W.2d at 375. Here, as we have indicated, the insurers may be seen to have either waived their rights to subrogation by conduct, or made a valid exercise of a joinder option. Either reading of the insurer's action would make *Lambert*'s bar on recovery by a plaintiff inapplicable.[5]

the insurer. The holding of *Bruner* can be seen to authorize the relation back of an insurer's cause of action when joined as a party. *See* sec. 802.09(3), Stats. Other jurisdictions reach this result on the theory that a party can intervene in a suit even if the statute of limitations has run on its original action. *See, e.g.,* Annotation, *When Does Statute of Limitations Begin to Run Upon an Action by Subrogated Insurer Against Third-Party Tortfeasor,* 91 A.L.R.3d 844, 849 nn.15–16; 16 *Couch on Insurance* 2d, sec. 61:234 at 293 n.1 (1983).

[4]*See also* Wis. Stat. Ann. sec. 803.03 at 78 (West 1977) (commentary) (quoting Clausen and Lowe, *The New Wisconsin Rules of Civil Procedure Chapters 801–803,* 59 Marq. L. Rev. 1, 89 (1976)) ("Subsection (2) of section 803.03 is designed to eliminate the confusion of statute of limitations questions with the rules governing joinder of parties"); Kircher, *Insurer Subrogation in Wisconsin,* 71 Marq. L. Rev. 46–47 n.41, 48–49 n.45 (1987–88).

[5]Under either reading, Garber is not exposed to any risk of "double, multiple or otherwise inconsistent obligations." *See* sec. 803.03(1)(b)2, Stats. The insurers cannot independently proceed against Garber, as any claim they might have has either been assigned, waived or satisfied in the Anderson judgment. In addi-

We conclude that medical expenses paid by an insurer are properly awarded where the insurer either waives or properly exercises its subrogation rights. We remand on this issue, with directions that the trial court reinstate the original jury award of $10,000 for medical expenses.

*By the Court.*—Judgment and orders affirmed in part; reversed in part and cause remanded with directions.

---

tion, unlike *Lambert* or *Heifetz v. Johnson,* 61 Wis. 2d 111, 211 N.W.2d 834 (1973), where the insurer was barred by the statute of limitations from pursuing an action against its insured to reclaim amounts previously paid, the plaintiff will only experience a "double recovery," *id.* at 124–25, 211 N.W.2d at 841, where an insurer waives its subrogation claim by conduct. *Lambert* reaffirmed that the collateral source rule applies where no subrogation exists, as in an investment contract. *Id.* at 119–21, 399 N.W.2d at 376. Where an insurer waives its subrogation rights, *see Radloff,* no subrogation exists, and the collateral source rule applies.